## DRUMMOND LIGHTERAGE CO. v. OREGON–WASHINGTON R. & NAV. CO.

Circuit Court of Appeals, Ninth Circuit.
June 13, 1927.

No. 5109.

**Wharves ⬉⟾20(5)—Stranding of car barge on marine dock or gridiron held due to negligence of bargeman.**

Evidence *held* to show that stranding of car barge on marine dock or gridiron was due to negligence of bargeman in taking draft of barge or depth of water, if taken at all.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Libel by the Drummond Lighterage Company against the Oregon-Washington Railroad & Navigation Company. From a decree dismissing the libel, libelant appeals. Affirmed.

Lawrence Bogle, Cassius E. Gates, W. A. Peters, John H. Powell, and Marion Edwards, all of Seattle, Wash., for appellant.

Lane Summers and Huffer, Hayden, Merritt, Summers & Bucey, all of Seattle, Wash., for appellee.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

RUDKIN, Circuit Judge. This is an appeal from a decree dismissing a libel in personam to recover damages caused by the stranding of a car barge, owned by the appellant, on a marine dock or gridiron, owned and maintained by the appellee. The gridiron was constructed by the appellee in 1922, adjacent to the East Waterway in the city of Seattle. In the work of construction, an excavation was made in the shore about 150 feet in length, 45 feet in width, and 8 feet 9 inches in depth. Piles were driven inside the space thus excavated, and timbers or stringers were strung horizontally along the inside of the piling, to keep the sand from drifting onto the floor of the gridiron. The floor was excavated 6 inches below the desired depth, and was then filled in with coarse gravel, so as to be practically level throughout its entire width and length. At the inshore end of the gridiron rails were laid 8 feet 3 inches above the floor, and the barges were so constructed that when they rested on the floor of the gridiron the rails on their decks were 8 feet 3 inches above the floor, or even with the rails on the inshore end. When a loaded barge was placed on the gridiron, it was filled with water by opening the valves, so that the barge would settle down on the floor of the gridiron. In that position the barge rails were even with the shore rails, so that cars could be removed from the barge to the shore railway, or from the shore railway to the barge. On the morning of May 23, 1924, the barge here in question was taken from a gridiron at Port Gamble and towed across Puget Sound, by a tug boat owned by the Cary-Davis Tug & Barge Company, to a point about half a mile distant from the gridiron. The tow line was then taken in and the barge was brought alongside the tug, to be placed in position to be shoved onto the gridiron. When the barge was brought to the entrance and placed with its

forward end about 6 feet inside the entrance, a line was extended from the barge to the inner side of the gridiron, to hold the barge in place until the tug could shift her position from the starboard quarter to the stern of the barge. As soon as the tug had assumed this latter position, she proceeded half or full speed ahead to shove the barge onto the gridiron, upon a signal from the bargeman, but when the barge had been shoved about two-thirds of the length of the gridiron it suddenly stuck. The tug put a line on the barge in an attempt to pull it off the gridiron, but the attempt failed, and as the tide continued to fall the stern of the barge outside the floor of the gridiron broke under the weight of the cargo of cars, causing the damages for which a recovery was here sought.

The amended libel alleged that the appellee suffered the gridiron to become unsafe and dangerous for the mooring of barges in this: "That at the mouth of the gridiron the bottom in the middle had become eroded by the action of the water for several feet in from the margin of East Waterway, so that when there was water in the gridiron the depth where the erosion had occurred was 8 or 10 inches greater than it ought to have been, and there had been formed on either side of the mouth of the gridiron small bars of sand 6 or 8 inches high."

The court below found that the appellant was negligent in attempting to place the barge on the gridiron when the water was too low to keep it afloat, and that this negligence was the sole cause of the accident. The testimony on the part of the appellant was indefinite and unsatisfactory. The bargeman in charge of the barge kept a log or record of the trip, showing, among other things, time of departure, causes of delay, and time of arrival. This log or record, kept in duplicate, was not produced at the trial, and the failure to produce one or the other of the copies was not satisfactorily explained. The bargeman was the principal witness for the appellant. He did not know the draft of the barge, light or loaded; he did not know the stage of the tide; he did not know the depth of the water in the gridiron; nor did he know the exact time when they attempted to enter the gridiron or when the barge became fast. He only knew that he had been instructed not to attempt to place the barges on the gridiron unless there was a foot of water to spare, and that he measured the draft of the barge and the depth of the water with a pike pole and ascertained that the requisite depth was there.

The remaining testimony on the part of the appellant was equally indefinite and unsatisfactory. But there was other testimony in the case that leads to a more satisfactory conclusion. The light draft of the barge, as given by one of the officers of the appellant, was from 16 to 20 inches. The weight of the load was known, and an expert called by the appellee testified that this weight would increase the draft by approximately 3 feet. This testimony was not contradicted or questioned. The draft of the loaded barge was therefore approximately 4 feet 6 inches, but the draft was heaviest at the stern, and it is safe to say that two-thirds way back, where the barge became fast on the gridiron, the draft was considerably in excess of 4 feet 6 inches. Further testimony on the part of the appellee showed that the depth of water in the gridiron at 9 o'clock was 5.32 feet; at 9:15, 4.92 feet; at 9:30, 4.52 feet; at 9:45, 4.02 feet; and at 10 o'clock, 3.52 feet.

The appellant conceded on the argument that the barge could not have been placed on the gridiron after 9:30, but it seems quite plain from the testimony that it could not have been placed there in safety at that late hour. The depth of the water was then approximately 4 feet 6 inches and the draft of the barge at the stern was in excess of that, so that any attempt to place the barge on the gridiron at that stage of the water could only result one way. The testimony as to the time when the barge became fast on the gridiron is left equally uncertain. Some of the witnesses fixed it as early as 8:30, while others fixed it as late as 10 o'clock, or even later. But these were mere estimates, as none of the witnesses pretended to know the exact time. The log kept by the master of the tug contained the following entry: "9:45. Fast O. W. grid; barge stuck two-thirds on grid. Tried to get barge off, but could not move it." If we assume that this entry is correct, we are still left in doubt as to the time elapsing between the time the barge became fast upon the gridiron and the time the entry was made. There was some testimony tending to show that the tug remained with the barge only 10 or 15 minutes after it became fast, but there was other testimony from which it might be inferred that it remained there longer. But, taking the testimony as a whole, we are satisfied, as was the court below, that it was negligence on the part of the appellant to attempt to place the barge on the gridiron at the time the attempt was made, and that that negligence was the proximate cause of the injury. The margin of safety would indeed be narrow, if two small

bars of sand, 6 or 8 inches high, such as are described in the amended libel, would cause the stranding of a heavy barge loaded as this was. True, there was some testimony at the trial tending to show that the sand bars were larger and higher, but there was likewise testimony tending to show that there were no sand bars there at all. And, while there may have been some erosions in the floor of the gridiron, we are satisfied that they were no deeper or more extensive than should have been anticipated, and that the bargeman was negligent in taking the draft of the barge and the depth of the water, if indeed he took them at all. Furthermore, it would seem that the distance from the surface of the water to the top of the gridiron would indicate to a man of common prudence, familiar with the situation, that it would be unsafe to attempt to land the barge under the circumstances disclosed by the record.

The findings of the trial court are, therefore, amply supported by the testimony, and its decree is accordingly affirmed.